# EXHIBIT I

```
           IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION



AUDREY WADSWORTH,            )
                             )
         Plaintiff,          )
                             )
    V.                       )   1:17-CV-08167
                             )
KROSS, LIEBERMAN & STONE,    )
                             )
         Defendant.          )
_____)




                     DEPOSITION
                        OF
                   KIMBERLY SMITH
                   MAY 17, 2018
             10:19 A.M. - 12:23 P.M.


               CASEWORKS - RALEIGH
         3739 National Drive, Suite 200
              Raleigh, North Carolina
```

Reported by: Michelle Maar, RDR, RMR, FCRR



```
 1            IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                      EASTERN DIVISION
 4
 5
 6
 7   AUDREY WADSWORTH,             )
                                   )
 8            Plaintiff,           )
                                   )
 9         V.                      )  1:17-CV-08167
                                   )
10   KROSS, LIEBERMAN & STONE,     )
                                   )
11            Defendant.           )
     _____)
12
13
14
15                       DEPOSITION
                            OF
16                     KIMBERLY SMITH
                       MAY 17, 2018
17               10:19 A.M. - 12:23 P.M.
18
19                  CASEWORKS - RALEIGH
             3739 National Drive, Suite 200
20                 Raleigh, North Carolina
21
22
23
24   Reported by: Michelle Maar, RDR, RMR, FCRR
25
```

```
 1    APPEARANCES:

 2    On Behalf of the Plaintiff:

 3         SMITHMARCO
           By: Andrew C. Wilson
 4         55 W. Monroe Street, Suite 1200
           Chicago, IL 60603
 5         312-546-6539
           Awilson@smithmarco.com
 6

 7


 8    On Behalf of the Defendant:

 9         THE BARTON LAW GROUP
           By: Dennis J. Barton, III
10         17600 Chesterfield Airport Road, Suite 201
           Chesterfield, MO 63005
11         314-306-4417
           Dbarton@bartonlawllc.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                            INDEX
 2
 3        Examination by Mr. Wilson..................... 4
          Examination by Mr. Barton..................... 77
 4        Further Examination by Mr. Wilson............. 80
 5
 6
 7                     DEPOSITION EXHIBITS
 8       Exhibit No.        Description                    Page
 9    Exhibit A       9-19-17 Letter to Audrey Wadsworth.. 45
10    Exhibit B       11-27-17 Print Debtor Work Card..... 38
11    Exhibit C       Defendant's Answer.................. 59
12    Exhibit D       Defendant's Responses to Plaintiff's
                      First Set of Interrogatories........ 60
13
      Exhibit E       9-15-16 Employment Offer............ 67
14
15
16
17
18
19
20
21
22
23
24
25
```

1    the image of a collection agency.
2        Q.   So the letter that was sent, that's Exhibit A, so
3    it has this language on the bottom, it says it's from a
4    debt collector.
5        A.   Yes.
6        Q.   That's the first thing they get from Kross,
7    Lieberman & Stone.  So wouldn't that sort of alert them
8    it's a debt collector?
9        A.   You mean Audrey?
10       Q.   I mean --
11       A.   First party or -- we have different letters for
12   different consumers.
13       Q.   Pre-collect consumers.
14       A.   Okay.  This, for PRA, would be specific to PRA.
15       Q.   Okay.  So a consumer with a PRA account --
16       A.   Yes.
17       Q.   -- would receive this letter that says it's from
18   a debt collector attempting to collect a debt.
19       A.   That is the template this was printed on, yes.
20       Q.   Okay.  So wouldn't that alert them a debt
21   collector is involved?
22       A.   It could potentially.  I mean, my e-mail says
23   this is an attempt to collect a debt and I'm not collecting
24   debts from my clients.
25       Q.   Okay.  And then -- let's see.  So the

1  determination of whether an account is pre-collect or
2  collections, I believe you said it's the decision of the
3  client, right?
4      A.   Correct.
5      Q.   Is there any -- do you give them any guidance in
6  deciding that?
7      A.   I do.
8      Q.   Okay.  Is there like a set of criteria or a
9  checklist or something like that that you would give them?
10     A.   Not from that perspective, no.
11     Q.   From what perspective?
12     A.   Just from what perspective it should move forward
13 to collections from our office.
14     Q.   So move forward from pre-collect to collections?
15     A.   Correct.
16     Q.   I mean in making the initial determination --
17 when they assign the account to you and say this is a
18 pre-collect account or this is a collections account, do
19 you give them any guidance in deciding that?
20     A.   No.  That's their decision.
21     Q.   Okay.  If you were to give them guidance, say, if
22 you had to give them a checklist or something, just your
23 opinion, what would be the differentiating criteria between
24 an account that goes to pre-collect and an account that
25 goes to collections?

| | | |
|---|---|---|
| 1 | A. | That the account was over 90 days or 120 days |
| 2 | old. | |
| 3 | Q. | 90 or 120? |
| 4 | A. | Uh-huh.  Between 90 and 120. |
| 5 | Q. | So if it was between 90 and 120 days old, you |
| 6 | think it should be -- | |
| 7 | A. | In collections, correct. |
| 8 | Q. | Where does that number come from? |
| 9 | A. | In my head. |
| 10 | Q. | Okay.  I wasn't sure if you saw it somewhere or |
| 11 | read it somewhere. | |
| 12 | A. | No. |
| 13 | Q. | Okay. |
| 14 | A. | I would say that's standard accounting. |
| 15 | Q. | Okay.  Now, so do you notice any difference in |
| 16 | the rate of success between pre-collect accounts and | |
| 17 | collections accounts? | |
| 18 | A. | I do. |
| 19 | Q. | What do you notice? |
| 20 | A. | I notice that they're more successful. |
| 21 | Q. | Pre-collect accounts are more successful? |
| 22 | A. | Yes. |
| 23 | Q. | How much more successful would you say? |
| 24 | A. | I would say 20 percent more collectible. |
| 25 | Q. | Okay.  Why do you think that is? |

1      A.    Because they're not in default.

2      Q.    How does that make a difference?

3      A.    Because now instead of us getting an account in

4   third-party collections after someone has already ignored

5   multiple statements, ignored calls, you know, ignored that

6   they owe a bill, these are usually accounts where it could

7   be an oversight and we've brought it to their attention.

8      Q.    Do you have any statistics or anything that

9   you've seen in what you've reviewed that shows how often a

10  consumer makes a dispute on an account?

11     A.    Do I have any statistics or things I've

12  reviewed --

13     Q.    That shows you how often a consumer has disputed

14  owing the money that you have collected from them.

15     A.    How often they've disputed when?

16     Q.    At any time.

17     A.    At any time?

18     Q.    Yes.

19     A.    I don't have any statistics, no.

20     Q.    Okay.  Do you have a general idea of how often

21  that comes up -- that Kross, Lieberman & Stone attempts to

22  collect money from a consumer and the consumer sends a

23  letter or calls and says I don't owe this money, I'm

24  disputing this?

25     A.    I do not know how often that comes up.  We have a

1  procedure for when that happens though.
2      Q.   Okay.  Do you -- does this happen on pre-collect
3  accounts as well?  Or is this just --
4      A.   It happened on this one.
5      Q.   Okay.  Do you see it on many other pre-collect
6  accounts?
7      A.   I don't know.
8      Q.   Okay.  Fair enough.  Do you think part of the
9  reason that the pre-collect accounts are more collectible
10 is because they're not being, is because consumers are not
11 being notified that they can dispute an account?
12     A.   No.  I don't think that's part of it at all.
13     Q.   You don't think so?
14     A.   No.
15     Q.   All right.  So let's take a look at Exhibit C
16 please.
17          (Exhibit C is marked for identification.)
18 BY MR. WILSON:
19     Q.   Have you seen this before?
20     A.   Briefly.
21     Q.   Okay.  Have you reviewed it before in any detail?
22     A.   Briefly.
23     Q.   Okay.  When was that?
24     A.   Monday and before Dennis filed.
25     Q.   Monday before Dennis filed?

1    A.   We never got the chance to speak to her and let
2    her know that.
3    Q.   Okay.  So when the client contacted you, they
4    said here's this account, we would accept three payments?
5    A.   Yes.
6    Q.   Was there a timeline for those three payments?
7    A.   There was --
8    Q.   Was there a deadline, three payments within a
9    certain amount of time?
10   A.   Ninety days.
11   Q.   So is it -- comparing this to a situation where
12   you're collecting on a collection account, an account that
13   we both agree would be a collection, hypothetical, account,
14   would this be similar to a payment plan on that account?
15   A.   We set up payment plans, yes.
16   Q.   So would a similar payment plan, is something
17   that could happen, we'll accept three payments in 90 days?
18   A.   That is something that could happen.
19   Q.   Okay.  So how was this different?  What makes
20   this one just an outstanding balance and the other ones a
21   default debt?
22   A.   Because the client didn't want it to be in
23   default.
24   Q.   Okay.
25   A.   The client wanted us to alert the employee that

1    she had been overpaid on her salary and that she needed to
2    return that money to them.
3        Q.   Okay.
4        A.   And she had an opportunity to pay it back without
5    the tax consequence.  Because PRA had already paid the
6    taxes on the payroll.
7        Q.   Okay.  Okay.  So when, when PRA notified Ms.
8    Wadsworth that they wanted this money, that you were going
9    to contact, that Kross, Lieberman & Stone was going to
10   contact her, is it fair to assume that she owed the debt at
11   that point?
12       A.   There was restitution that needed to be made,
13   yes.
14       Q.   Restitution?
15       A.   Yes.
16       Q.   Okay.  When would you say was the first date that
17   she owed this money, that she had to pay it back, that she
18   had an obligation to pay it back?
19       A.   She had an obligation to pay it back when she
20   broke her contract with our client as far as her employment
21   agreement.  And then it became an overpayment of her
22   payroll.
23       Q.   And when you say when she broke her contract,
24   what do you mean by that?  What did she do to break her
25   contract?

1      A.    I don't know what she did in particular to break
2  her contract.  I know she's no longer employed.  And part
3  of the employment contract -- which also outlays her
4  payroll, her 100,000 dollars she's going to make every
5  year -- also included that the bonus needed to be repaid if
6  the contract was not completed.
7      Q.    Okay.  And as far as you remember, was there a
8  date that it had to be repaid, like within a certain number
9  of days?
10     A.    I don't know that their agreement states that.
11     Q.    Okay.
12     A.    I know it can be deducted from her last paycheck.
13 So I would assume they would want restitution immediately.
14     Q.    Okay.  So how much money did PRA ask you to
15 collect from Ms. Wadsworth?
16     A.    Initially the 6135 that's on the Exhibit B.
17           MR. WILSON:  I don't have the agreement as an
18 exhibit right now.
19           I'll introduce another exhibit, Exhibit E.
20           (Exhibit E is marked for identification.)
21 BY MR. WILSON:
22     Q.    Have you seen this before?
23     A.    Yes.
24     Q.    Could you describe what it is?
25     A.    It is the offer letter that is sent to employees

1  at PRA.
2      Q.  Okay.  And is this the agreement, the contract
3  that you're talking about?
4      A.  Yes.  It says it's an offer of employment.
5      Q.  Uh-huh.  And this lays out the sign-on bonus and
6  the obligation to repay?
7      A.  The salary, the benefits, yes.
8      Q.  Okay.  So if you look at the sign-on bonus, it is
9  for 7500 dollars, correct?  If you add up the two parts.
10     A.  Correct.
11     Q.  Okay.  So do you know why PRA was only asking for
12  6135?  Do you know why the difference?
13     A.  I do.
14     Q.  Why?
15     A.  Taxes.
16     Q.  Okay.
17     A.  At the point it is not in default, they're
18  willing to accept the net amount that the employee
19  received.  Once it goes to default, it becomes the 7500.
20     Q.  Okay.
21     A.  They're offering an opportunity for that employee
22  to pay back the net.
23     Q.  Okay.  So now I believe you said it was put into
24  default after 90 days?
25     A.  Yes.

```
1        Q.    Now is it up to 7500?
2        A.    Yes.
3        Q.    I don't see that reflected in the account
4   history.  I don't see a change in the balance anywhere.
5        A.    There wouldn't be on that.
6        Q.    Why wouldn't it be on here?
7        A.    Because that is not a collection account.
8        Q.    So this was --
9        A.    This was prior to it going to --
10       Q.    Is there a separate history once it became a
11  collection account?
12       A.    Other than a stamp that says it's credit reported
13  at this point.
14       Q.    Okay.
15       A.    And the amount is changed, yes.
16       Q.    Okay.  So this account wasn't, it was a
17  pre-collect account and now it's a collection account,
18  correct?
19       A.    When I was sued, it was a pre-collect account.
20  It's no longer a pre-collect account.
21       Q.    Okay.  So is there an updated version of this
22  document that shows that it's a collection account and the
23  balance?
24       A.    I would have to look.  It might be on another
25  account number because I'm no longer working that account.
```